JUDGE COTE

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------X

THE MKR GROUP, INC.,      :

      :     Civil Action No.

     Plaintiff,    :

      :

- against -     :

      :

CAPCOM CO., LTD., CAPCOM U.S.A., INC.,   :    **COMPLAINT**

and CAPCOM ENTERTAINMENT, INC.,   :    **JURY TRIAL**

     Defendants.   :

------------------------------------------------------------X



Plaintiff The MKR Group, Inc. (hereinafter referred to as "Plaintiff"), by its attorneys Kenyon & Kenyon LLP, as and for its Complaint against defendants Capcom Co., Ltd., Capcom U.S.A., Inc., and Capcom Entertainment, Inc., alleges as follows, upon knowledge with respect to itself and its own acts, and upon information and belief as to all other matters:

<u>INTRODUCTION</u>

1.     This an action at law and in equity to remedy acts of, *inter alia*, copyright infringement, trademark infringement, false designation of origin and misrepresentation, false advertising, dilution, unfair competition, misappropriation and deceptive trade practices.

2.     Plaintiff is a New York corporation with its principal place of business at 1133 Avenue of the Americas, New York, New York 10036.

3.     Defendant Capcom Co. Ltd. is a corporation organized under the laws of Japan, with its principal place of business at 3-1-3 Uchihiranomachi, Chuo-ku, Osaka, Japan. Defendant Capcom U.S.A., Inc. is a California corporation with its principal place of business at 800 Concar Drive, Suite 300, San Mateo, California 94402. Defendant Capcom Entertainment,

Inc. is a California corporation with its principal place of business at 800 Concar Drive, Suite 300, San Mateo, California 94402. Upon information and belief, Defendant Capcom U.S.A., Inc. is a wholly owned subsidiary of defendant Capcom Co. Ltd. Defendant Capcom Entertainment, Inc. is, in turn, a wholly owned subsidiary of Capcom U.S.A., Inc. Defendants Capcom Co. Ltd.., Capcom U.S.A., Inc., and Capcom Entertainment, Inc. are collectively referred to herein as "Capcom".

## JURISDICTION AND VENUE

4.       This action arises under the Copyright Act of 1976, 17 U.S.C. § 101 *et seq.* This action also arises under the Lanham Act of 1946 (as amended), 15 U.S.C. § 1051 *et seq.*, and under related state statutory and common laws. Subject matter jurisdiction over this action is conferred upon this Court by 15 U.S.C. §1121 and 28 U.S.C. §§ 1331, 1338 and 1367. Additionally, because this action concerns an amount in controversy that exceeds $75,000, exclusive of costs and interest, and is between citizens of different states, subject matter jurisdiction is also proper pursuant to 28 U.S.C. § 1332. This Court has supplemental jurisdiction over all state law claims under 28 U.S.C. § 1367(a), and under principles of pendent jurisdiction.

5.       Venue is proper pursuant to 28 U.S.C. § 1391(b) and (c) because Defendants are doing and transacting business in this Judicial District; have substantial contacts with this Judicial District; and Defendants have advertised in this Judicial District and have caused many of the tortious acts complained of herein in this Judicial District.

## GENERAL ALLEGATIONS

6.     Plaintiff is an independent motion picture and television producer and, through authorized licensees, a seller of ancillary merchandise.  Plaintiff's president and principal shareholder is Richard P. Rubinstein, who is the individual producer of the original 1979 film "GEORGE A. ROMERO'S DAWN OF THE DEAD" and the senior credited producer of the 2004 remake, as described more fully below.  Mr. Rubinstein and George A. Romero, the acclaimed writer and director of "GEORGE A. ROMERO'S DAWN OF THE DEAD", are the significant participants in the profits which Plaintiff and its predecessors-in-interest have earned from the exploitation of these films beginning almost 30 years ago.  Plaintiff (including its predecessors-in-interest, affiliates and licensees) has been producing financially and critically successful feature films and television programs in the horror, fantasy and science fiction genres for over 25 years, including "GEORGE A. ROMERO'S DAWN OF THE DEAD" (1979), "STEPHEN KING'S PET SEMATARY" (1989), "STEPHEN KING'S THE STAND" (1994), "FRANK HERBERT'S DUNE" (2000), and a remake of "DAWN OF THE DEAD" (2004), which was distributed by Universal Studios.

7.     Among Plaintiff's most successful franchises is its "DAWN OF THE DEAD" Motion Pictures.  Plaintiff's DAWN OF THE DEAD Motion Pictures are extremely famous, and have been financially successful as both theatrical releases and DVDs.  The first of Plaintiff's "DAWN OF THE DEAD" Motion Pictures was released in 1979.  Plaintiff's 1979 film (the "1979 Film") has been continuously exploited in the marketplace for more than 28 years, and continues to earn significant revenue, as evidenced by the more than one million DVD units which have been shipped in the last three years alone, and by the October 4, 2007 Blu-ray DVD release by Starz Media.  Considering that the 1979 Film's budget was approximately 650,000 dollars, the 1979 Film is one of the most profitable horror films of all time.

8.      In addition to the continuing and current outstanding commercial success of the 1979 Film, it has garnered unparalleled critical acclaim.  Roger Ebert, the renowned film critic for *The Chicago Sun-Times*, noted that "'Dawn of the Dead'" is one of the best horror films ever made...," giving the 1979 Film a full four star rating.  A true and correct copy of Roger Ebert's May 4, 1979 review of DAWN OF THE DEAD is attached hereto as Exhibit "A."  In 2005, the DVD release of the 1979 Film won the Academy of Science Fiction, Fantasy & Horror Films' prestigious "Saturn Award" for "Best DVD Classic Film Release."  (By comparison, E.T.: THE EXTRA-TERRESTRIAL won this category in 2002.)

9.      The 2004 remake of DAWN OF THE DEAD (the "2004 Remake") was co-produced and released by Universal Pictures under a one picture license from Plaintiff.  Both the 1979 Film and the 2004 Remake were produced by Richard P. Rubinstein, a principal of Plaintiff.  The 2004 Remake was the most popular film in the U.S. on its opening weekend, grossing nearly 27 million dollars in U.S. box office receipts.  To date, the 2004 Remake has grossed over 100 million in worldwide box office.  Film critics have also praised the 2004 Remake.  For example, *The Los Angeles Times* stated, "Good zombie fun, the remake of George A. Romero's 'Dawn of the Dead' is the best proof in ages that cannibalizing old material sometimes works fiendishly well."  A true and correct copy of the March 19, 2004 review is attached hereto as Exhibit "B."

10.     Plaintiff's DAWN OF THE DEAD Motion Pictures have spawned an extensive merchandise licensing program via Plaintiff's licensing agent, New Line Cinema, a division of Time Warner, Inc.  Through over 10 licensees, Plaintiff is selling such items as action figures, t-shirts, wallets, belts, wristbands, Halloween costumes, Halloween masks, posters, calendars, playing cards, postcards, button pins, patches and stickers.    Illustrations of Plaintiff's merchandise are attached hereto as Exhibit "C."

- 4 -

11.    Plaintiff is the exclusive owner of the trademarks and service marks for "DAWN OF THE DEAD", "GEORGE A. ROMERO'S DAWN OF THE DEAD", and the "Zombie Head" Design (collectively, the "DAWN OF THE DEAD Trademarks") for use in connection with a wide variety of products and services, including without limitation computer games. A list of these trademarks, including corresponding registrations and applications in the United States Patent and Trademark Office (the "PTO"), and true and correct copies of the registration certificates are set forth in Exhibit "D" attached hereto.

12.    Plaintiff's DAWN OF THE DEAD Motion Pictures exploit the metaphor of flesh-eating zombies who take over a shopping mall as a device to showcase the insidious perils of consumerism and suburbia. They expose how materialism has turned suburbanites into mindless zombies who have fallen prey to the siren call of the shopping mall. American popular culture is replete with films and television series that gleefully expose the dysfunctionality of suburbia and "mall culture", including "FAST TIMES AT RIDGEMONT HIGH" (1982); "L.A. STORY" (1991); "CLUELESS" (1995); "WELCOME TO THE DOLLHOUSE" (1995); "AMERICAN BEAUTY" (1999); "ELECTION" (1999); "THE SAFETY OF OBJECTS" (2001); "*Weeds*" (2005-present); and "*The Office*" (2005-present). However, only Plaintiff expressed this phenomenon through the brilliant conceit of zombies at the mall. By juxtaposing shockingly profane and gory zombies with the hopelessly mundane and antiseptic shopping mall, Plaintiff's unique take allows the viewer to bear witness to the sinister undertow of "mall culture".

13.    Plaintiff's unique commentary on suburban mall culture is so well known that it is regularly discussed by commentators around the world. Indeed, almost thirty years after release of the 1979 Film, journalists have written:

- 5 -

- "George Romero's 'Dawn of the Dead' is ostensibly a story about a group of people struggling to survive in a world taken over by flesh-eating zombies. But it is also a commentary on the lurid appeal of shopping malls...." *The Economist*, December 22, 2007.

- "The American economy may very well come to resemble scenes from the two *Dawn of the Dead* movies. And that's the good news. *Asia Times Online*, January 3, 2008.

True and correct copies of the above-referenced articles are attached hereto as Exhibit "E."

14.    On or about August 8, 2006, Capcom released the "Dead Rising" Game (the "Game") without the consent of Plaintiff. The Game is essentially a computer game version of Plaintiff's DAWN OF THE DEAD Motion Pictures. Both the 1979 Film and the Game explore this conceit using eerily similar tone, mood and settings. Both works are dark comedies. In both, the recreational activities of the zombies and absurdly grotesque "kill scenes" provide unexpected comedic relief. As noted above, both works are much more than a garden variety "slasher" film or "shoot 'em up" game, respectively. Both works provide thoughtful social commentary on the "mall culture" zeitgeist, in addition to serving up a sizable portion of sensationalistic violence. The violence and special effects in both works are very similar, and the gore, which is often absurd, ensures that both works are perceived as social commentaries. Some of the most glaring similarities between 1979 Film and the Game are:

- Both works are set in a bi-level "mega" shopping mall in a rural area. The shopping mall is the center of these communities.

- The central conflict of both works is a major battle between the zombies and the would-be survivors for possession of the mall.

- In both works, the survivors are desperately trying to keep the zombies from invading the mall, which is a sanctuary containing all the supplies one might need to survive.

- Both works feature much of the action on a mall rooftop (complete with helicopter landing pad), in a helicopter, in an open atrium plaza with fountains, in an elevator, in an abandoned service corridor, and in utilitarian "safe" rooms, one of which has controls to the mall's infrastructure while the others are ersatz bedrooms.

- In both works, the protagonists try to figure out the mystery of the zombies, i.e., "what are they?"

- In both works, the survivors scavenge the mall for food and weapons, using any found object as a weapon to kill the zombies. Both works allow viewers to explore their fantasy of looting an abandoned mall.

- In both works, the map of the mall is an essential tool to survival.

- In both works, in addition to the zombies, the protagonists must fend off murderous psychopaths. These are the murderous and psychotic "Motorcycle Raiders" in the 1979 Film, and the "Bosses" in the Game. The Game also features the yellow-coated, green-faced "Cultists" who are an analogue to the orange-robed, green-faced "Hare Krishna" zombie in the 1979 Film.

- In both works, the shared plot is largely a pretext for displaying incredible, exaggeratedly violent special effects such as zombies having their heads blown off, and blood splattering kills with corresponding fountains and pools of blood throughout the mall. The special effects work that created by Tom Savini for the 1979 Film was regarded as groundbreaking; the Game brazenly copies Mr. Savini's

NY01 1480147 v1

signature special effects.  In both works, killing zombies is so baroquely gruesome that it becomes comedic.

- Both works feature the unique physical comedy of watching zombies play sports, i.e., in the 1979 Film, the zombies ice skate, or more accurately, ice shuffle, and the Game features "zombie bowling."  Both works successfully juxtapose sensationalistic violence with the mundane, inviting viewers to enjoy zombies being killed at a suburban mall from the comfort of their sofa.

- In both works, the zombies constantly crave human flesh and lumber around aimlessly if there are no survivors to eat.  Once a zombie hones in on a survivor, other zombies quickly swarm in on this hapless victim.

- In both works, the leading male characters are hard-boiled, tough, cynical journalists. Both works feature a critique of sensationalistic journalism.  For example, the Game's male protagonist, Frank West, who is a freelance photographer, is *literally* awarded points for taking photographs that capture graphic violence.

- At times, the works have similar dialogue.  For example, in the Game, a survivor, dressed oddly in a shirt that Elvis may have owned, tells Frank West that "This [the zombie infested mall] is hell".  This line is a direct reference to the most memorable line from the 1979 Film that a survivor speaks to Stephen, the traffic reporter: "When there's no more room in hell, the dead will walk the earth."  This line has been the tagline for the 1979 Film since its initial release.  The copyright rights to this line (in favor of one of Plaintiff's predecessors-in-interest) have been expressly recognized in federal court. *See, Dawn Associates v. Links,* 203 U.S.P.Q. 831, 835 (N.D. Ill. 1978).

- 8 -

- Both works are set in motion by a helicopter that takes the lead characters to the mall which is under siege by crazed flesh-eating zombies. In addition, in both works, the helicopter is the survivors' means of escape from the zombie-infested mall.

- In both works, the main characters hide out in "safe rooms", tentatively explore the mall's plazas, and visit gun shops to amass an arsenal to defend themselves from zombies who threaten to storm the mall.

- In both works, zombies are punched, decapitated, and mowed down by vehicles. Most do not appear to die until they receive fatal blows to the head or their brains are separated from the rest of their bodies.

- The Game directly quotes iconic scenes from the 1979 Film such as a panoramic shot of the mall parking lot teeming with zombies. Many scenes are shot from the perspective of a hovering helicopter, capturing images of troops deployed on the ground to keep at bay the zombies who are strolling the countryside. In both works, Muzak-style music playing in the mall provides comedic relief.

- In the Films, a signature zombie wears a distinctive plaid flannel shirt. A zombie in a plaid shirt has become a trademark of the DAWN OF THE DEAD Motion Pictures, and Plaintiff (acting through a licensee) sells a "PLAID BOY" Halloween costume consisting of a blood stained, distressed plaid shirt and a zombie mask. In the Game, a zombie wearing a plaid shirt is prominently featured.

The foregoing list is non-exhaustive, and does not attempt to set forth all similarities between the two works. Moreover, many of the above-described elements of the 1979 Film are repeated in the 2004 Remake.

15.    The works' similarities are exacerbated by Capcom's placement of a "disclaimer" on the packaging for the Game, which states:

"THIS GAME WAS NOT DEVELOPED,
APPROVED OR LICENSED BY THE OWNERS
OR CREATORS OF GEORGE A. ROMERO'S
DAWN OF THE DEAD"

This "disclaimer" – which was not requested by Plaintiff – actually highlights the connection between Plaintiff's DAWN OF THE DEAD Motion Pictures and the Game. In addition, Capcom displays a colorable imitation of Plaintiff's famous ZOMBIE HEAD trademark on the packaging for the Game. A true and correct copy of the Game's packaging is attached hereto as Exhibit "F."

16.    Capcom's wholesale adoption of Plaintiff's works is so brazen that the creator of the Game, Keiji Inafune, wore a "Dawn of the Dead" t-shirt in a recent interview. In another interview, Mr. Inafune admitted that he wanted to "create a different type of zombie game ... [one with] a sort of comical element ... like in the George Romero movies." Mr. Inafune remarked, "[W]e also wanted to add ... what zombies are to us is a symbol of mankind's greed, of their desire to eat, of their hunger. And that's what they're supposed to be in this game: a symbol." True and correct copies of Mr. Inafune's interviews with *Gamespy.com* and *TeamXbox.com* are attached hereto as Exhibit "G."

17.    Numerous game industry critics, commentators and reporters have recognized the high degree of similarity between Plaintiff's DAWN OF THE DEAD Motion Pictures and the Game. For example:

- "The video game's setup is a complete theft of the 1978 George A. Romero classic 'Dawn of the Dead,' right down to the Muzak being piped through the mall speakers." *San Francisco Chronicle*, August 15, 2006.

- "*Dead Rising* is best described as an interactive version of George A. Romero's horror flick, *Dawn of the Dead*, in which a flesh-eating mob of zombies attempts to break into a shopping mall to attack the people inside." *USA Today*, August 17, 2006.

- "It's a gorgeous and fully interactive game world ripped straight out of George Romero's Dawn of the Dead.  Just like in that movie, the characters in Dead Rising choose to take refuge in the best place to find food and weapons." *Computerandvideogames.com*, March 23, 2006.

- "Taking a page directly from George Romero's classic gorefest *Dawn of the Dead*, the majority of *Dead Rising*'s action takes place inside a large mall that's been overrun by the undead." *Gamespy.com*, January 6, 2006.

- "You won't have to look at more than a few frames of *Dead Rising* to realize its similarities to Romero's *Dawn of the Dead*." *Teamxbox.com*, May 12, 2006.

- "Lately however, zombie movies have gone from cheesy to cheesier, taking a back seat to other horrifying tales until a few years ago when George A. Romero's original *Dawn of the Dead* was remade for present times.  It was both satirical and horrifying, taking a place in a world where zombies had overrun the rest of civilization, less a few survivors who took to the once safe haven of a shopping mall.  Replace the title of *Dawn of the Dead* with *Dead Rising* and you've basically got the premise for Capcom's first voyage on the Xbox 360." *Teamxbox.com*, July 12, 2006.

- "[D]awn of the Dead"]…took a satirical look at everything from the consumer culture permeating American society to racism to the skewed way the media covers disasters….I was a bit surprised, then, that Capcom would so obviously lift the setting

for their latest zombiefest, called *Dead Rising*, from George Romero's masterpiece. Didn't they know that fans would cry foul?" *Gamespy.com*, July 6, 2006.

- "[T]his is a game you should play for how well it appreciates, honors, and finally does justice to its subject material. The front of the box carries this disclaimer: 'This game was not developed, approved, or licensed by the owners or creators of George A. Romero's Dawn of the Dead'. Yeah, whatever, Capcom lawyers. We've been waiting a long while for a developer to live up to the potential of Romero's vision. And as we said at the top of this review: It's about time!" *Yahoo! Games*, August 10, 2006.

- "Like Clive Barker's Jericho, it was also refused classification by the USK. With it's [sic] unremitting gore, it's [sic] got an almost slapstick violence that harks back to moments in Evil Dead and of course Dawn of the Dead. If there was a video nasty for the Xbox 360 then Dead Rising, with its casually horrific disembowlings [sic], cannibalism and voyeurism, is it." *Xboxer.tv*, January 31, 2008.

True and correct copies of articles discussing the similarities between Plaintiff's DAWN OF THE DEAD Motion Pictures and the Game are attached hereto as Exhibit "H."

18.    The Game has been incredibly popular, selling over 500,000 units within just fifteen days of its August 8, 2006 official release date in the U.S. On September 11, 2006, *Gamespot.com* reported that Capcom spent at least $6 million on television advertisements. A true and correct copy of the *Gamespot* article is attached hereto as Exhibit "I." On January 10, 2007, Capcom announced in a press release that it had sold over a million units of the Game by the end of December 2006. A true and correct copy of the January 10, 2007 press release is attached hereto as Exhibit "J." Moreover, *Joystiq.com* has reported a rumor that Capcom plans

- 12 -

to develop and market sequels to the Game. A true and correct copy of the February 5, 2008 article is attached hereto as Exhibit "K." Upon information and belief, Capcom has announced that it will develop a feature film based on the Game.

19.    Due to the Game's resounding success, it has been a major driver of Capcom's superior financial performance in its past fiscal year from an overall corporate perspective. Further, the technology developed in the Game's production, including the "MT Framework" game engine, has, through its use in the Game, been a "hit" with the gaming community, and as a result, has been utilized by Capcom in other blockbuster titles. The Game's meteoric success also has contributed to making Xbox 360 one of the most popular consoles. According to *Game Daily* (January 17, 2008 edition), annual sales of the Xbox 360 console topped 4.62 million units in 2007. A true and correct copy of the above-referenced article is attached hereto as Exhibit "L."

PARTIES' DEALINGS

20.    In or about April 2004, a representative of Capcom contacted Plaintiff to request a license to use elements from Plaintiff's DAWN OF THE DEAD Motion Pictures in the Game. However, Capcom failed to follow through on this request, and no license was ever negotiated or granted.

21.    In or about March 2006, Plaintiff discovered that Capcom was proceeding with the Game, and Plaintiff immediately placed Capcom on notice of its objection by a letter dated March 17, 2006 from Plaintiff's agent, New Line Cinema. A true and correct copy of this letter is attached as Exhibit "M."

22.    Later in 2006, Plaintiff discovered that Capcom U.S.A., Inc. had applied to register "DEAD RISING" as a trademark in the PTO under Application Serial No. 78/633,771.

- 13 -

On January 29, 2007, Plaintiff filed a Notice of Opposition (No. 91175392) against this application before the Trademark Trial and Appeal Board of the PTO. This opposition proceeding is currently pending.

23.     Following their initial communications regarding this matter, the parties engaged in settlement discussions, but these discussions have been unsuccessful. Moreover, in an effort to forestall Plaintiff from taking legal action to protect its rights, Capcom strung Plaintiff along by professing a desire to settle, while at the same time failing to respond to Plaintiff's good faith settlement proposals. Most recently, in November 2007, Capcom requested a suspension of the deadline for answering Plaintiff's aforementioned Notice of Opposition, on the ground that settlement discussions were ongoing. When Plaintiff pointed out to Capcom that Capcom had yet to respond to Plaintiff's settlement proposal of September 4, 2007, Capcom represented that a response would promptly follow. Based on this express representation, Plaintiff consented to the suspension. However, Capcom used the additional time *not* to respond to Plaintiff's proposal, but to instead prepare and file its Answer to the Notice of Opposition. Capcom's actions – namely, procuring an extension of time under false pretenses – are reflective of its blatant disregard for Plaintiff's rights throughout the history of this matter.

24.     By engaging in the aforesaid acts and conduct, Defendants, and each of them, have caused and will continue to cause grave and irreparable injury to Plaintiff's intellectual property. Given the enormous popularity of the Game, the damage to Plaintiff is staggering.

## COUNT I
## COPYRIGHT INFRINGEMENT

25.     This count is to remedy acts of copyright infringement, and arises under 17 U.S.C. § 101 *et seq.*

26.    Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 24 of this Complaint as though fully set forth herein.

27.    The expression contained in the 1979 Film is wholly original, and is copyrightable subject matter under the copyright laws of the United States.

28.    As of January 30, 1979, a Certificate of Registration was issued by the Register of Copyrights for the 1979 Film, and bears registration number PA0000033519. A true and correct copy of a print-out from the U.S. Copyright Office's database setting forth the particulars of this registration is attached hereto as Exhibit "N".

29.    Plaintiff is the sole owner of all right, title and interest in and to the copyright in the 1979 Film and the expression it contains. Plaintiff has complied in all respects with the provisions of the Copyright Act of 1976.

30.    The 2004 Remake is an authorized derivative work based on the 1979 Film, and was co-produced and distributed under license from Plaintiff. Those elements from the 2004 Remake which were copied from the 1979 Film are owned by Plaintiff.

31.    The expression contained in the 2004 Remake is wholly original, and is copyrightable subject matter under the copyright laws of the United States.

32.    As of April 21, 2004, a Certificate of Registration was issued by the Register of Copyrights for the 2004 Remake, and bears registration number PA0001212817. A true and correct copy of a print-out from the U.S. Copyright Office's database setting forth the particulars of this registration is attached hereto as Exhibit "O." Plaintiff has complied in all respects with the provisions of the Copyright Act of 1976.

NY01 1480147 v1

33.   Capcom has knowingly and willfully copied the DAWN OF THE DEAD Motion Pictures in the creation, distribution and marketing of the Game. Capcom had direct access to the DAWN OF THE DEAD Motion Pictures by virtue of their widespread and long-term distribution and exhibition. Indeed, the 1979 Film is uniformly considered the seminal zombie film, and, as noted *supra*, the creator of the Game even mentioned in an interview that he based the Game on the 1979 Film.

34.   Defendants have infringed Plaintiff's copyright rights in the DAWN OF THE DEAD Motion Pictures. Defendants knew or should have known that the DAWN OF THE DEAD Motion Pictures are protected by copyright. Each of the Defendants continues to infringe on Plaintiff's rights in and to its copyrighted works by producing, marketing and distributing the Game, and otherwise exploiting rights that belong exclusively to Plaintiff.

35.   The natural, probable and foreseeable consequence of Defendants' wrongful conduct has been and will continue to be to deprive Plaintiff of the benefits of its intellectual property and of the licensing, marketing and promoting of the DAWN OF THE DEAD Motion Pictures.

36.   As a direct and proximate result of Defendants' infringing use of Plaintiff's copyrighted material, Defendants have realized and continue to realize profits and other benefits rightfully belonging to Plaintiff. Accordingly, Plaintiff has suffered and will continue to suffer severe injuries and damage, and is entitled to those damages permitted by federal copyright law. Plaintiff therefore seeks an award of damages pursuant to 17 U.S.C. § 504, as well as its costs and attorneys' fees pursuant to 17 U.S.C. § 505, in amounts to be determined at the time of trial.

37.   To halt the ever-mounting injury to Plaintiff, Plaintiff hereby requests that the Court issue temporary, preliminary and permanent injunctive relief, restraining Defendants from

NY01 1480147 v1

further infringing or otherwise violating Plaintiff's intellectually property rights as herein described.  Plaintiff has no adequate remedy at law.

COUNT II
VIOLATIONS OF LANHAM ACT

38.    This count is to remedy acts of trademark infringement, false designation of origin, false description and representation, unfair competition, false advertising in commerce, and dilution, and arises under 15 U.S.C. § 1051 *et seq.*

39.    Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 37 of this Complaint as though fully set forth herein.

40.    Defendants' extensive use in the Game of elements from the DAWN OF THE DEAD Motion Pictures, and its marketing of the Game in ways which highlight such elements-- including without limitation use of the title "DEAD RISING," a zombie head image on packaging, and a "disclaimer" which actually highlights the parties' connection-- are likely to cause consumers and the trade to mistakenly believe that the Game is produced and/or distributed by Plaintiff, and/or is produced and/or distributed by Capcom under license from Plaintiff.  Plaintiff's extensive exploitation of ancillary merchandise based on the 1979 Film, as described in paragraph 10 hereof, would lead consumers and the trade to reasonably believe that the Game is simply another product in Plaintiff's "DAWN OF THE DEAD" merchandise line.

41.    Defendants' unlawful and improper actions as set forth above are likely to cause confusion, mistake or deception as to the source, origin or sponsorship of the Game, and to falsely mislead the trade and public into believing that the Game originates from, is affiliated or connected with, or is sponsored, authorized, approved or sanctioned by Plaintiff.

42.    Plaintiff's DAWN OF THE DEAD Trademarks are inherently distinctive and, by virtue of Plaintiff's extensive use, advertising and promotion of the DAWN OF THE DEAD

- 17 -

Trademarks as set forth above, the DAWN OF THE DEAD Trademarks serve as an exclusive designation of origin of Plaintiff and of its goods and services, and as a symbol of the goodwill and high-quality reputation represented by the famous DAWN OF THE DEAD Trademarks. Plaintiff's DAWN OF THE DEAD Trademarks have developed enormous secondary meaning and goodwill among the public and trade. Such secondary meaning (in favor of one of Plaintiff's predecessors-in-interest) has been expressly recognized in federal court. *See, Dawn Associates v. Links*, 203 U.S.P.Q. 831, 836 (N.D. Ill. 1978). Defendant's trademark DEAD RISING is confusingly similar to Plaintiff's trademark DAWN OF THE DEAD. Moreover, Capcom displays a colorable imitation of Plaintiff's "Zombie Head" Design on the Game's packaging.

43.     Defendants' activities constitute an infringement of Plaintiff's registered DAWN OF THE DEAD Trademarks under § 32(1) of the Trademark Act (15 U.S.C. § 1114(1)).

44.     Defendants' activities constitute the use by Defendants of a false designation of origin; false description and representation in commerce; unfair competition; and false advertising in commerce, all in violation of § 43(a) of the Trademark Act (15 U.S.C. §1125(a)).

45.     Plaintiff's DAWN OF THE DEAD Trademarks are famous marks under § 43 (c) of the Trademark Act (15 U.S.C. § 1125(c)). Defendants' unlawful activities alleged herein constitute dilution of the DAWN OF THE DEAD Trademarks in violation of 15 U.S.C. § 1125(c).

46.     Defendants' acts of trademark infringement, false designation of origin, false description and representation, unfair competition, false advertising and dilution have caused Plaintiff to sustain monetary damage, loss and injury, in an amount to be determined at the time of trial.

47.     Defendants have engaged and continue to engage in this activity knowingly, deliberately and willfully, so as to justify the assessment of treble damages against them, in an amount to be determined at the time of trial.

48.     To halt the ever-mounting injury to Plaintiff, Plaintiff hereby requests that the Court issue temporary, preliminary and permanent injunctive relief, restraining Defendants from further infringing or otherwise violating Plaintiff's intellectually property rights as herein described. Plaintiff has no adequate remedy at law.

49.     For the reasons hereinabove set forth, Plaintiff hereby requests that the Court deny registration to Capcom, U.S.A., Inc.'s Application Serial No. 78/633,771 for "DEAD RISING," pursuant to § 37 of the Trademark Act (15 U.S.C. § 1119).

COUNT III
VIOLATION OF NEW YORK
GENERAL BUSINESS LAW

50.     This count is to remedy acts of dilution, injury to business reputation, and deceptive acts or practices, and arises under New York General Business Law §§ 349 and 360-l.

51.     Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 49 of this Complaint as though fully set forth herein.

52.     Defendants' activities constitute dilution and injury to the business reputation of Plaintiff, in violation of Plaintiff's rights under New York General Business Law § 360-l.

53.     Defendants' activities constitute deceptive acts or practices in the conduct of business, trade or commerce, or in the furnishing of services in the State of New York, in violation of New York General Business Law § 349, and Plaintiff has been injured by reason of such deceptive acts or practices.

NY01 1480147 v1

54.     Defendants' violations of New York General Business Law §§ 349 and 360-1 have caused Plaintiff to sustain monetary damage, loss and injury, in an amount to be determined at the time of trial.

55.     Defendants have engaged and continue to engage in this activity knowingly, deliberately and willfully, so as to justify the assessment of exemplary and punitive damages against them, in an amount to be determined at the time of trial.

56.     To halt the ever-mounting injury to Plaintiff, Plaintiff hereby requests that the Court issue temporary, preliminary and permanent injunctive relief, restraining Defendants from further infringing or otherwise violating Plaintiff's intellectually property rights as herein described.  Plaintiff has no adequate remedy at law.

COUNT IV
TRADEMARK INFRINGEMENT, UNFAIR COMPETITION,
MISAPPROPRIATION AND DILUTION (COMMON LAW)

57.     This count is to remedy acts of trademark infringement, unfair competition, misappropriation and dilution under the common law of, *inter alia*, the State of New York.

58.     Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 56 of this Complaint as though fully set forth herein.

59.     Defendants' activities as described herein constitute common law trademark infringement; unfair competition; misappropriation of and trading upon the fine reputation and goodwill of Plaintiff; the unjust diversion from Plaintiff to Defendants of the benefits arising therefrom; and dilution.

NY01 1480147 v1

60.    Defendants' acts of common law trademark infringement, unfair competition, misappropriation and dilution have caused Plaintiff to sustain monetary damage, loss and injury, in an amount to be determined at the time of trial.

61.    Defendants have engaged and continue to engage in this activity knowingly, deliberately and willfully, so as to justify the assessment of exemplary and punitive damages against them, in an amount to be determined at the time of trial.

62.    To halt the ever-mounting injury to Plaintiff, Plaintiff hereby requests that the Court issue temporary, preliminary and permanent injunctive relief, restraining Defendants from further infringing or otherwise violating Plaintiff's intellectually property rights as described herein.  Plaintiff has no adequate remedy at law.

<u>PRAYER FOR RELIEF</u>

WHEREFORE, Plaintiff prays for judgment against Defendants as follows:

A.    For a temporary, preliminary and permanent injunction enjoining and restraining Defendants and each of their officers, agents, servants, employees and attorneys, and those persons acting in concert or participation with them who receive actual notice of the Order by personal service or otherwise, from:

(1)    producing, distributing, selling or otherwise exploiting the Game;

(2)    engaging in any infringement of Plaintiff's copyright rights in and to the DAWN OF THE DEAD Motion Pictures;

(3)    using Plaintiff's DAWN OF THE DEAD Trademarks (however spelled, whether capitalized, abbreviated, singular or plural, printed or stylized, whether used alone or in combination with any word or words, and whether used in caption, text, orally or otherwise), or any other reproduction, counterfeit, copy, colorable imitation or confusingly

- 21 -

similar variation of Plaintiff's DAWN OF THE DEAD Trademarks, as a trade name, trademark or service mark, or in any other manner which suggests in any way that Defendant and/or its activities, products or services originate from, are affiliated with, or are sponsored, authorized, approved or sanctioned by Plaintiff, or that Plaintiff and/or its activities, products or services are affiliated in any way with Defendants;

(4)     infringing or diluting the DAWN OF THE DEAD Trademarks;

(5)     using in connection with Defendants' activities, products or services any false or deceptive designation, representation, description or advertisement of Defendants or of their activities, products or services, whether by symbols, words or statements, which would damage or injure Plaintiff or give Defendants an unfair competitive advantage in the marketplace;

(6)     violating New York General Business Law Sections §§ 349 and 360-1;

(7)     engaging in acts of state or common law trademark infringement, unfair competition, misappropriation or dilution which would damage or injure Plaintiff; and

(8)     inducing, encouraging, instigating, aiding, abetting or contributing to any of the aforesaid acts.

B.     That all materials, packaging, labels, tags, pamphlets, brochures, signs, sales literature, stationary, advertisements, contracts, documents, materials and the like in the possession or under the control of Defendants, including without limitation all copies of the Game, and all plates, molds, matrices, negatives, masters and other means of making the same, which might, if used, violate the Order herein granted, be delivered up and destroyed as the Court shall direct.

- 22 -

C.    That Defendants file with the Court and serve on counsel for Plaintiff within thirty (30) days after service on Defendants of such Order, or within such extended time period as this Court may direct, a report in writing and under oath, setting forth in detail the manner and form in which Defendants have complied with the Order.

D.    For an award of Defendants' profits and Plaintiff's damages resulting from Defendants' unlawful acts set forth herein, in an amount to be proven at the time of trial, together with legal interest from the date of accrual thereof.

E.    For an award of treble damages pursuant to 15 U.S.C. § 1117.

F.    For an award of punitive damages, in an amount to be proven at the time of trial.

G.    That Plaintiff be awarded the costs of this civil action, together with Plaintiff's reasonable attorney fees, pursuant to 17 U.S.C. § 505, 15 U.S.C. § 1116 and/or 15 U.S.C. § 1117, and the equity powers of the Court.

H.    That Plaintiff be awarded such other and further relief as the Court may deem equitable and proper.

Dated: February 25, 2008

KENYON & KENYON LLP

Attorneys for Plaintiff
MKR GROUP, INC.

Jonathan D. Reichman (JR3243)
Mimi K. Rupp (MR0007)
One Broadway
New York, New York 10004
Tel:    (212) 425-7200
Fax:    (212) 425-5288

NY01 1480147 v1